IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**RICKY SWEET,**

    Petitioner,

vs.

                                              **CASE NO. 4:07cv295-SPM/WCS**

**WALTER A. McNEIL,**

    Respondent.

_____/

## SECOND REPORT AND RECOMMENDATION

This is an amended petition for writ of habeas corpus filed by Ricky Sweet pursuant to 28 U.S.C. § 2254. Doc. 8. Petitioner challenges his convictions for burglary of a structure with a person assaulted and battered, and for battery, in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number R02-2155AF. Petitioner is serving a sentence of life imprisonment on the first count as a prison releasee reoffender.

Respondent filed an amended answer, doc. 15, and Petitioner filed a traverse, doc. 17. Respondent agrees that the petition was timely filed. Doc. 15, p. 8. An initial report recommendation was adopted by the court. Docs. 18 and 21 (rejecting the

procedural defense as to ground one and dismissing ground two).  Respondent addressed the merits of ground three in its first response, and has now filed a response addressing the merits of ground one.  Doc. 23.[1]  Petitioner has filed a traverse.  Doc. 25.  Thus, this second report and recommendation addresses the merits of grounds one and three.

The state record was filed in paper form as an attachment to the original response, doc. 10, exhibits A through W, and to the second response, doc. 23, exhibits X and Y.  This report and recommendation will refer to the state record by exhibit letter and page number.

**Summary of the trial evidence**

The following is a summary taken from Petitioner's initial brief on direct appeal, and from the record.  In May of 2002, Kenyatta Pope and Tavoris Cloud, Petitioner's brother, lived in a residence owned by Frank Isom.  Ex. E, p. 5.  Pope's son also lived with her there.  *Id.*  Petitioner Ricky Sweet was also living there when Ms. Pope moved in.  *Id.*  On May 21, 2002, Isom called the police and asked them to remove Petitioner from the premises.  *Id.*  Petitioner was ordered by the police to leave the house for good.  *Id.*

On May 31, 2002, Mr. Isom, who was in the advanced stages of multiple sclerosis, had to be taken to the hospital.[2]  *Id.*  Petitioner was there that day helping

---

[1] Documents 23 and 24 are identical, except that document 23 contains an index to the supplemental exhibits X and Y (one page filed as doc. 23-2).  The exhibits are in paper form.

[2] The nature of his illness is in the record elsewhere.  He died before the trial.

Isom and his wife move Mr. Isom's things to a backyard shed. *Id*. Ms. Pope testified that as of May 30, 2002, Petitioner was not living at the home. *Id*., p. 6. Cloud said that Petitioner, as his brother, could visit him whenever he wished and needed no invitation. *Id*.

Later on May 31, 2002, Petitioner returned to the house and told Ms. Pope he wanted to talk with her. *Id*. He had a beer in his hand. *Id*. Petitioner could not remember what he wanted to talk to Pope about and she went back inside and locked the front door. *Id*.

Pope then heard someone coming in the backdoor and saw Petitioner entering the home. *Id*. Petitioner asked her "why she won't give him what he wants and in the process is touching her." *Id*. Pope retreated to her room, locked the door, and called 911. *Id*. An audiotape of the 911 call was played for the jury. *Id*. On the audiotape, Ms. Pope is yelling constantly for Petitioner to stop. Ex. J. Ms. Pope testified that Petitioner assaulted her during this period.

Pope then saw Tavoris Cloud returning, and she banged on her window to get his attention. *Id*., p. 7. Petitioner picked up a vacuum cleaner and broke the glass of the door. *Id*. Pope held her hand against the door to keep Petitioner out. *Id*. When Cloud arrived, Petitioner exited through the front door and he had a knife in his hand. *Id*.

Cloud threw a beer bottle at Petitioner. *Id*. Petitioner swung the knife at Cloud. *Id*. The police officer who arrived drew his gun on Petitioner and ordered him to drop the knife and get on the ground. *Id*. Petitioner ran away. Petitioner was arrested several days later for trying to get on a train without a ticket.

**Section 2254 Standard of Review**

For a claim fairly presented and adjudicated on the merits in state court, and pursued through one complete round of the review process, Petitioner must show that the state court's adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1) and (2); Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). Only adjudication of the merits, not an explanation or written opinion, is necessary for this deference to apply. Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002) ("all that is required is a rejection of the claim on the merits, not an explanation."); Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 776 (11th Cir. 2003) (same); Herring v. Sec'y for the Dep't of Corr., 397 F.3d 1338, 1347 (11th Cir.), *cert. denied*, 546 U.S. 928 (2005) ("[e]ven a summary, unexplicated rejection of a federal claim qualifies as an adjudication entitled to deference under § 2254(d).").

If Petitioner can show that the state court's adjudication satisfies § 2254(d)(1) or (2), then this court reviews the federal claim on the merits, without the deference otherwise required. Panetti v. Quarterman, __ U.S. __, 127 S.Ct. 2842, 2858-59, 168 L.Ed.2d 662 (2007); Jones v. Walker, 496 F.3d 1216, 1228 (11th Cir. 2007) (citing Panetti).

The law governing ineffective assistance of counsel claims was clearly established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984). Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520;

Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."  Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,* 531 U.S. 1204 (2001).  *See also* Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing Chandler).  There are no rigid requirements or absolute duty to investigate a particular defense.  Fugate v. Head, 261 F.3d at 1217*.*

> Indeed, "[c]onsidering the realities of the courtroom, more is not always better.  Stacking defenses can hurt a case.  Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."

*Id.*

For prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

**Ground one, alleged prosecutorial misconduct**

Petitioner asserts that he was denied due process during his trial by several comments and arguments made by the prosecutor. Doc. 8, pp. 3-5. Petitioner makes four factual allegations in support of this claim in this court. The four will be addressed separately.

**Argument and questions involving the 911 audiotape**

Petitioner first contends that during both the opening and closing statement, the prosecutor argued to the jury that Petitioner could be heard on the 911 audiotape telling the victim, "give me what I want." Doc. 8, p. 3. He argues that this assumed facts not in evidence because the transcript of the audiotape from the 911 emergency call does not contain a statement by anyone to that effect. *Id.* Petitioner argues that this false statement was important because the prosecutor had to show that Petitioner entered the home with intent to commit a crime therein. *Id.* He also asserts that no witness testified that it was Petitioner's voice on the tape. *Id.*, p. 4. He argues that it was prosecutorial misconduct to ask Petitioner's brother, Tavoris Cloud: "So you don't recognize your brother's voice on the tape?" since no witness had identified Petitioner's voice on the tape. *Id.*

The trial court denied this claim on the merits without discussion. Ex. M, p. 140. That determination is entitled to deference by this court.

In opening argument, the State asserted that the victim asked Petitioner to leave, and called him "Duke" on the tape, which was his nickname. Ex. Y, p. 17. The transcript of the tape incorrectly reports this as "Dude." Ex. Y. The prosecutor said that the jury would hear the victim testify that before the 911 call, Petitioner "tells her, give

me what I want, give me what I want." *Id.*, at 14. Then, describing what would be heard on the audiotape of the 911 call, it was argued by the prosecutor:

> You'll also hear the television in the background. Try to focus on what you're hearing the victim say. And last, but not least, it's difficult to catch, listen carefully you will hear the defendant say on that tape, give me what I want.

*Id.*, at 17-18.

The victim testified that at the beginning of her encounter with Petitioner, Petitioner said: "KP, why don't you just give me – KP is my nickname. Why you won't give me what I want." Ex. Y, p. 38. She said she ran into her room, locked the door, and called 911. *Id.*

A portion of the audiotape of the 911 telephone call was published to the jury on July 15, 2003, during the trial.[3] Ex. Y, p. 42. A copy of the transcript of this audiotape is Ex. J. The transcript of the portion of the audiotape of the 911 call that was heard by the jury reveals the following. The female caller first said "I'm fixing to call the police, dude [sic, Duke]." Ex. J, p. 2. The 911 operator asked her to describe her emergency and then asked her to state what was "going on." *Id.* The caller said: "This man has came in the house without permission. Oh, Lord, please, get somebody here fast." *Id.* The operator asked her name and she said: "I need a police officer here fast. Please,

---

[3] Only a portion of the audiotape of the 911 call was played for the jury. Ex. I, R. 676 (order on remand). The court said:

> The jury was not allowed independent access to the tape. The parties stipulate that the portion of the tape that was played to the jury is reflected in the transcript from page 2, line 4 through page 10, line 14.

*Id.* See also Ex. N, p. 6.

I've got my baby here.  Dudge [sic], you're scaring my baby."  *Id.*  There was the sound of a baby crying and then the caller spoke twice to the man that was there, calling him "Dude" [sic] and pleading with him to stop.  *Id.*  The operator asked her to state the person's name "that's in your house?"  *Id.*, at 3.  The caller said: "His name is Ricky.  Stop, Ricky.  Please get somebody here.  They've got to come through the back door.  Dude, please."  *Id.*  She continued to call the man "Dude" [Duke] after that and pleaded with him to stop, to not touch her.  *Id.*  The caller said that the man knew she had called 911.  *Id.*, at 3-4.  She then said: "here comes Tavares [Tavoris]."  *Id.*, at 4.  The tape then contains some confusion and lack of response to questions, the baby was screaming and crying, and then, when asked if an officer was with her, the caller said: "They're chasing him."  *Id.*  After an extended conversation, the caller said she was with her roommate, whom she identified as Tavares [Tavoris].  *Id.*, at 7.  She then identified her assailant as "my roommate's brother."  *Id.*, p. 8.  She said her assailant "took off" when "his brother got here."  *Id.*  The brother then got on the phone and identified his brother as Ricky Sweet and gave Sweet's date of birth.  *Id.*, at 9.  The transcript, therefore, does not contain evidence that a male voice said "give me what I want."

      Tavoris Cloud was called as a witness for the prosecution.  Exhibit Y, p. 65.  He identified Petitioner, Ricky Sweet, as his brother.  *Id.*  Later in the testimony, Cloud said he knew nothing about a 911 tape.  *Id.*, at 86.  A portion of State's Exhibit 1, the transcript of the 911 tape, was again published.  *Id.*, at 93.  Cloud said he did not know whether one of the voices on the tape was his.  *Id.*  He said he recognized a male voice on the tape, and then was asked the allegedly offending question: "So you don't recognize your brother's voice on the tape?"  *Id.*  Cloud said no.  *Id.*

> In closing, Petitioner's attorney first argued:
>
> You couldn't hear his voice on there. You heard a television going. You heard her yelling. You didn't hear Ricky Sweet on there. Nobody said Ricky Sweet was ever on the tape.
>
> There was a male voice. We don't know if it came from the television. We don't know if it came from Mr. Cloud. Another gaping hole in the State's case that they want you to fill in.

Ex. Y, p. 154. The prosecutor argued you could hear four voices on the 911 audiotape. *Id*., at 161. The tape was available for the jury to hear again. *Id*. The prosecutor argued:

> You hear, regardless of whether he wants to identify his voice today, you hear Tavoris Cloud say, I told you not to f— with him.
>
> And you hear the voice of the defendant in the beginning of the tape when he says, just give me what I want. When he came into that house, you're going to have to decide if he had the intent to commit a crime.
>
> And what I would ask you to look at are his actions once he gets into the house. His actions are to pick up a vacuum cleaner, break a window and try to get to the victim. You know, we can't put you inside the defendant's mind. You're going to have to look at the facts of the case. You're going to have to look at the evidence.

*Id*., at 162. The prosecutor argued that "[i]t can only be circumstantial evidence [to prove intent]." *Id*. He argued that "his actions clearly show that he intended to assault or batter her once he got into the house," that he touched, rubbed, and grabbed her arm against her will, and "[t]hat's a battery." *Id*., at 163.

The purpose of closing argument under Florida law is to review the evidence with the jury and to argue inferences that may be drawn from the evidence:

> The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence. Conversely, it must not be used to inflame the minds and

>passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.

Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985); Dessaure v. State, 891 So. 2d 455, 468 (Fla. 2004).  "Merely arguing a conclusion that can be drawn from the evidence is permissible fair comment."  Mann v. State, 603 So. 2d 1141, 1143 (Fla. 1992).

Prosecutorial argument does not constitute reversible error unless such argument renders the trial so fundamentally unfair as to amount to a denial of due process, or unless the statement so prejudices another specific constitutional right, such as the privilege against self-incrimination, as to amount to denial of that specific right.  Donnelly v. DeChristoforo, 416 U.S. 637, 643-645, 94 S.Ct. 1868, 1871-1872, 40 L.Ed.2d 431 (1974).   As reiterated by the Eleventh Circuit:

>To find prosecutorial misconduct, a two-element test must be met:  "'(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant.' " *United States v. Gonzalez*, 122 F.3d 1383, 1389 (11th Cir.1997) (quoting *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir.1991)); *see also United States v. Thomas*, 62 F.3d 1332, 1343 (11th Cir.1995).  "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome [of the trial] would be different." *United States v. Hall*, 47 F.3d 1091, 1098 (11th Cir.1995) (citing *Kennedy v. Dugger*, 933 F.2d 905, 914 (11th Cir.1991)).  The court makes this determination in the "'context of the entire trial and in light of any curative instruction.' " *United States v. Chirinos*, 112 F.3d 1089, 1098 (11th Cir.1997) (quoting *United States v. Beasley*, 72 F.3d 1518, 1525 (11th Cir.1996)); *Thomas*, 62 F.3d at 1343 (curative instruction may render prejudicial remark harmless).

United States v. Wilson, 149 F.3d 1298, 1301 (11th Cir. 1998).

>In determining whether improper argument rises to this level, "we must ask whether there is a 'reasonable probability' that, but for the prosecutor's offending remarks, the outcome of the [guilt or] sentencing [proceeding] would have been different."  "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome."

Kennedy v. Dugger, 933 F.2d 905, 914 (11th Cir. 1991) (citation omitted).

The questions to Tavoris Cloud, asking him whether he could identify one of the male voices on the audiotape as that of his brother, Ricky Sweet, were completely proper and based upon the evidence. It is immaterial that no one testified that one of the voices was that of Petitioner. The victim identified the Petitioner as the person who was assaulting her while she made the 911 call. The audiotape confirms this identification as she repeatedly used his nickname, Duke, and when asked to identify her assailant, told the operator it was Ricky, Ricky Sweet.

Petitioner has not shown that he was denied a fundamentally fair trial by the prosecutor's opening and closing argument. The argument was simply that on the audiotape, if one listened closely enough, one could hear a male voice say "give me what I want." While the court reporter who transcribed the audiotape did not pick up that voice, that does not mean that it was not fair comment by the prosecutor as to what one might hear on the tape if one listened closely. The jury heard the tape, and could judge for themselves. Further, the victim herself plainly testified that when he came in the back door, but before the 911 call was made, Petitioner said to the victim: "Why you won't give me what I want." Ex. Y, p. 38. This aspect of ground one is without merit, as the trial court so found.

### Burden of proof

The second part of this claim is that the prosecutor misstated the State's burden of proof during voir dire. Doc. 8, p. 4. Petitioner has abandoned this claim, doc. 25, p. 6, and it will not be addressed here.

**Demeaning Petitioner**

The third part of this claim is that the prosecutor "demeaned" Petitioner by referring to him "as a man who wouldn't take 'no' for an answer." Doc. 8, p. 4.  He argues that this caused an "adverse emotional feeling toward the defendant." *Id*.  This was a fair comment based upon the audiotape and other evidence, including the testimony of the victim.  Prosecutorial misconduct has not been shown.

**Misleading questions**

The fourth aspect of this claim is that the prosecutor asked a misleading question.  *Id*., p. 5.  The prosecutor had asked Tavoris Cloud whether he had ever invited his brother to come to "the house" on May 31, 2002, the date of the offense, and Mr. Cloud said he did not necessarily invite him, explaining, "[t]hat's my brother, he can come whenever he wants to."  *Id*.  The allegedly misleading question followed this: "But you knew that the police had told him that he wasn't to come to that residence; isn't that correct?"  *Id*.  Petitioner asserts that he was a "lawful tenant at 807 Jacqueline Lane" on that date.  *Id*.  He argues that he was a lawful tenant on May 31, 2002, despite the fact (which he admits) that ten days earlier, on May 21, 2002, he had been issued a trespass warning by the police to not enter that residence again.  *Id*.  The gist of Petitioner's argument is that this was a misleading question because it implied that Cloud was prohibited by the police trespass warning from inviting Petitioner to the residence.

Cloud plainly said he did *not* invite Petitioner to come to the residence because he thought his brother could come when he wanted to.  Thus, the premise of the claim is missing.  More important, even if Cloud had said he had invited Petitioner to the

home, Cloud was a tenant. Frank Isom owned the residence and he was living there at the time of the "no trespass" order. Since Frank Isom had obtained a police trespass order against Petitioner's entry into the premises, then the implication of the question, that Cloud had no authority to invite Petitioner to the house, was entirely correct.

> The complete passage at issue here is the following:
>
> Q    Did you ever invite your brother to come over to the house on May 31st of the year 2002?
>
> A    I didn't necessarily have to invite him. He knew I was there. You know what I'm saying. That's my brother, he can come to see me whenever he wants to.
>
> Q    But you knew that the police had told him he wasn't to come to that residence; isn't that correct?
>
> A    On the 31st?
>
> Q    On the 21st, the police had already been out there and told him not to return; correct?
>
> A    Yeah, on the 21st.

Ex. Y, p. 76. These questions were properly connected to the evidence. Cloud had already said: "on the 30th, Mr. Frank Isom [the owner, see page 81] called the police on him to ask him to leave the premises." *Id.*, p. 68. When shown the police report, Cloud said that the report refreshed his memory, and that the police had come to the residence on May 21, 2002. *Id.*, at 71. Later, Officer Clemons testified that on May 21, 2002, he went to the residence and Mr. Isom, the owner, "wanted Mr. Sweet to leave his residence and not return." *Id.*, pp. 96-97. Officer Clemons ordered Petitioner to leave the residence. *Id*. Officer Clemons said:

> So what we did is we gave him a verbal warning, we told him he couldn't come back for the day. He can come back tomorrow to retrieve the rest of his clothes, and *then he would have to leave for good.*

*Id.*, at 98 (emphasis added). The question to Cloud was completely proper. As Petitioner himself admitted during the Rule 3.850 evidentiary hearing, "The police put me out on the twenty-first." Ex. M, p. 55. Indeed, he told his lawyer this before the trial. *Id.*, at 99.

In summary, ground one is without merit. Petitioner has not shown that the state court's adjudication of this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1) and (2)

**Ground two**

The court is without subject matter jurisdiction to determine ground two, as it has previously ruled. Doc. 21.

**Ground three**

Petitioner claims that his trial attorney was ineffective for failing to assert his speedy trial right. Doc. 8, p. 6. Petitioner asserts that he was arrested on June 4, 2002, five days after the incident, and charged with boarding a train without a ticket. *Id.*, at 6. On October 28, 2002, while still in the Gadsden County Jail, he was "arrested" and charged with the instant offenses. *Id.* Petitioner argues that the 175 days for trial provided by Florida's speedy trial rule, FLA. R. CRIM. P. 3.191, expired on April 21, 2003, and his lawyer should have immediately moved for his discharge. *Id.*, at 7. Instead, the venire of the jury was sworn in on July 14, 2003, 259 days after his arrest on the

charges. He contends that his attorney was ineffective for failing to move for his discharge after April 21, 2003. He argues that had the state not been able to bring him to trial within 15 days of the date of the motion, he would have been forever discharged "from these crimes." *Id.*, at 8. Respondent addressed the merits of this claim in the first answer. Doc. 15, pp. 22-28.

Respondent has made a compelling argument from the record that Petitioner was not "arrested" on the instant charges until February 7, 2003. Doc. 15, p. 4, n. 3. Nonetheless, Respondent concedes that the state court's ruling on Petitioner's Rule 3.850 seems to assume that the "arrest" for speedy trial purposes occurred on October 28, 2002, and does not press that argument. *Id.* and p. 26.

An evidentiary hearing was held on Petitioner's Rule 3.850 motion raising this claim and others. Petitioner's attorney testified that Petitioner challenged her on everything, told her that "he had been in the system long enough that he understood the law," and thought that he could not be convicted of burglary because he had a key. Ex. M, pp. 82, 88. When asked whether Petitioner ever asked her to assert his speedy trial rights, Petitioner's attorney said:

> No, sir, he did not. He kept believing – he let it go on because he was of the firm belief that Ms. Pope [the victim] would never show up to testify. He was adamant that she would not show up to testify. He just wanted to drag it on.

*Id.*, at 84. The prosecution offered a five year sentence for a plea, and Petitioner initially said he wanted to accept the offer, and then he changed his mind and rejected the offer. *Id.*, p. 90. Petitioner's attorney explained: "Again, he was of the belief that Ms. Pope would not show." *Id.* Petitioner's attorney placed into evidence a letter that Petitioner

sent to her on June 23, 2003, stating that he was "not in the least upset by the fact that the State has obtained a continuance. As a matter of fact, I am delighted." Ex. M, p. 129.

The trial court accepted this evidence provided by Petitioner's attorney as true. *Id*., at 131. The court said:

> I'm going to find that there was no ineffective assistance of counsel on Ms. Coulter's part [for failure to assert Petitioner's right to a speedy trial]. There was no prejudice on the defendant's part.
>
> I accept Ms. Coulter's testimony. The defendant indicated he was glad he got a continuance. I reject the defendant's testimony on that. So I deny the motion on that basis.

*Id*.

In effect, therefore, the court denied the ineffective assistance of counsel claim with respect to assertion of speedy trial rights based upon its finding of fact that Petitioner agreed to delay, rejecting a plea offer for a five year sentence and seeking delay of the trial because he thought that the victim ultimately would not testify. Petitioner has not shown that the state court's adjudication of this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1) and (2). The claim, therefore, affords no relief in this court.

**Conclusion**

Accordingly, it is **RECOMMENDED** that this 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Ricky Sweet challenging convictions for burglary of a structure with a person assaulted and battered, and for battery, in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number R02-2155AF, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on September 18, 2008.


s/    William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**